UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| MICHELE JACOBSON, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 4:18-cv-00249-AGF |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Michele Jacobson was not disabled, and thus not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the reasons set forth below, the decision of the Commissioner will be affirmed.

## BACKGROUND

The Court adopts the statement of facts set forth in Plaintiff's Statement of Uncontroverted Facts, which is contained in Plaintiff's brief (ECF No. 16-1), as supplemented by Defendant (ECF No. 22-1), and Defendant's Statement of Additional Facts (ECF No. 22-2), which Plaintiff has not opposed. Together, these statements provide a fair description of the record before the Court. Specific facts will be discussed as needed to address the parties' arguments.

Plaintiff, who was born on July 8, 1967, filed her applications for benefits on March 25, 2014. She alleged disability beginning May 5, 2012,[1] due to illiteracy, bipolar disorder, a tumor surrounding her pituitary gland, tendonitis, and low bone density.[2] On April 22, 2014, Plaintiff's applications were denied at the administrative level, and she thereafter requested a hearing before an Administrative Law Judge ("ALJ").

After an initial hearing, a denial of Plaintiff's claim by the ALJ, and a remand by the Appeals Council of the Social Security Administration,[3] a re-hearing was held on September 7, 2017. Plaintiff, who was represented by counsel, and VE Jeffrey Francis Magrowski, Ph.D., testified at the hearing. Plaintiff's counsel stipulated to the VE's qualifications to testify as a VE. Tr. 89.

At the hearing, the ALJ referred to a Reading Assessment Report dated July 19, 2016, which was completed by psychologist Sandra Carusa, Ph.D., after she examined

---

[1] Plaintiff previously filed applications for disability benefits under Title II, the most recent of which was denied on December 11, 2013. Tr. 97. In the present case, the ALJ found that, by alleging a disability onset date of May 5, 2012, Plaintiff was implicitly requesting reopening of the prior denial of claims. The ALJ held that the record did not establish good cause for reopening and that the scope of the present decision was therefore limited to the period post-dating December 11, 2013. However, the ALJ stated that he still considered evidence dated before December 12, 2013 for context and historical purposes. Tr. 11. Plaintiff has not challenged the ALJ's findings regarding the disability onset date in her brief before this Court.

[2] As Plaintiff's legal arguments relate only to her mental impairments, this Memorandum and Order does not discuss Plaintiff's physical impairments.

[3] The Appeals Council remanded the case in order for the ALJ to address a request by Plaintiff's counsel to submit additional interrogatories to a vocational expert ("VE") to whom the ALJ had submitted interrogatories after the initial hearing on Plaintiff's claim, and to offer Plaintiff an opportunity for a new hearing. Tr. 126-29.

Plaintiff. Dr. Carusa administered the Wide Range Achievement Test, Fourth Edition (WRAT4), and she reported that Plaintiff's reading composite score and word reading ability were both profoundly impaired at less than the 1st percentile; and Plaintiff's spelling was severely impaired at the 1st percentile. Dr. Carusa further reported that Plaintiff's grade level reading was approximately at the second grade and that Plaintiff's reading deficits left her functionally unable to read. Tr. 618-19.

At the hearing, the ALJ asked the VE about Plaintiff's past relevant work as a cashier, in light of this Reading Assessment Report. Plaintiff had testified at the initial hearing that she previously worked as a cashier at several retail stores; for example, she testified that she worked at Target for seven years with good performance reviews before she quit to find a higher paying job. Tr. 40-45.

The ALJ engaged the VE in the following line of questioning with respect to Plaintiff's past work:

> Q  Dr. Magrowski, we previously classified [Plaintiff's] work. In your opinion, as well as per the [Dictionary of Occupational Titles ("DOT")], could a person who has – well, let me ask you maybe a different way, is that [Plaintiff] had testing done indicating her – based upon the scores indicated that [Plaintiff] was unable to functionally read. Okay, in your estimation would that be a Reading Level Zero?
>
> A  It sounds like it and it's not compatible with the DOT and the jobs she's done.
>
> Q  In your opinion, could a person with Reading Level Zero, an ability to functionally read be able to perform that work?
>
> A  No because, according to the DOT and I looked it up, these jobs require at least a language level of 2 and they're able to read comic books, adventure books and use a dictionary and these jobs are considered

semiskilled with [a Specific Vocational Preparation ("SVP")] of 3.

Q      Now based upon – now understanding that the DOT is somewhat outdated and antiquated, do you have an opinion as to whether or not in the current national economy a person who is not able to functionally read could perform that work?

A      No.

Q      I'm sorry?

A      I don't believe she could.

Q      Okay.

A      I do have an opinion and I don't believe that she could work.

Q      Well, but a person with an ability to functionally read would not be able to perform that work in the national economy?

A      That's correct, without special accommodations.

Q      Okay. Have you had occasion or are you aware of what you know accommodations that might be customarily made for employers such as Walmart, you know these –

A      That's – I've never seen it where the person couldn't read a label or understand what she was ringing up as a cashier, but as she described it, she kind of made that situation occur so that she could perform the job.

Tr. 90-91.

Next, the ALJ asked the VE questions regarding a hypothetical person described as:

a person of [Plaintiff's] age, education and work experiences without exertional limitations, that is limited to occupations where only simple, verbal communication – well, or that the hypothetical individual could perform work with simple, verbal communication, but not written communication and that work would be limited to simple, routine, repetitive tasks in a low stress work environment defined as only occasional decision making and occasional changes in the work setting and only occasional interaction with the public, coworkers and supervisors.

4

Tr. 92.

In response to the ALJ's questions, the VE testified that such a hypothetical person could not perform Plaintiff's past work, but that the person could perform other work in the national economy, such as the unskilled jobs of garment bagger, bottling line attendant, and food preparer. Tr. 92-93. The VE testified that these jobs would be "outside of the DOT." Tr. 92. When asked to explain, the VE responded: "I think most of the jobs in the DOT require some level of reading and you did say simple, verbal. . . . [B]ased on your simple verbal and no written that would probably preclude most DOT jobs." Tr. 93. But the VE testified that, in his opinion, a person with the limitations described above could perform the three jobs identified, notwithstanding the DOT's requirements. Tr. 94.

When asked to explain the basis for his opinion, insofar as it was inconsistent with the DOT, the VE testified that the basis for his opinion was his "37 years of experience in work in the field of vocational rehabilitation and as a vocational expert witness, along with Government studies." Tr. 94. The VE also indicated that he did not "know at what point sheltered work may come," but in response to further questioning, the VE confirmed that the "jobs that [he was] referring to are not being performed within a sheltered workshop," and that those jobs would instead be "in the national economy." Tr. 94.

Plaintiff's counsel then asked the VE whether he had a "national practice," to which the VE responded affirmatively and then added that his "national practice [was] more as a vocational expert witness." Tr. 95.

By decision dated October 3, 2017, the ALJ found that Plaintiff had the residual

5

functional capacity ("RFC") to perform the full range of work at all exertional levels as defined by the Commissioner's regulations, except that Plaintiff had the following non-exertional limitations:

> [Plaintiff] is limited to performing only simple, routine, and repetitive tasks in a low-stress work environment, defined as only occasional decision-making, only occasional changes in the work setting, and only occasional interaction with supervisors, co-workers, and the general public. [Plaintiff] is limited to occupations that involve only simple verbal communication, and no written communication.

Tr. 17.

In formulating this RFC, the ALJ considered but ultimately assigned little weight to the opinion evidence submitted by Plaintiff's treating psychiatrists, Farida Farzana, M.D., and Miggie Greenberg, M.D. Specifically, the ALJ noted that both treating psychiatrists assessed Plaintiff to be "unable to meet competitive standards" or to have "no useful ability to function" in almost all areas of functioning, and both opined that Plaintiff would be absent from work more than four days each month. However, the ALJ found that the extreme limitations in these opinions were inconsistent with the psychiatrists' own treatment notes and the treatment notes of other treating psychiatrists, almost all of which reflected normal mental status examinations, no mental status abnormalities, conservative treatment, and evidence that Plaintiff's mental impairments were controlled with medication. The ALJ further noted that Dr. Farzana's opinion was dated January 11, 2016, more than a year after she had stopped treating Plaintiff. The ALJ noted that Dr. Farzana's treatment notes during the time that she was treating Plaintiff consistently

6

indicated that Plaintiff's bipolar disorder was in "full remission." Tr. 23-24.

The ALJ also gave little weight to the Global Assessment of Functioning ("GAF") scores[4] of 40 to 50—indicating major or serious impairment—that Dr. Farzana and Dr. Greenberg assigned to Plaintiff. The ALJ noted that, when Dr. Farzana was treating Plaintiff, Dr. Farzana consistently assessed Plaintiff to have a GAF score of 90, indicating essentially normal functioning, and Dr. Farzana "abruptly" changed this GAF score to 40 on the date she provided her medical source statement, by which time Plaintiff was no longer her patient. The ALJ further found that GAF scores are generally of little use in assessing the severity and limiting effects of a claimant's mental limitations. Tr. 23-24.

The ALJ then considered the testimony of Plaintiff's husband at an earlier evidentiary hearing. Plaintiff's husband had testified that Plaintiff was unable to handle even normal stressors, she had emotional outbursts, and she was unable to complete regular household chores. The ALJ found that the husband's testimony was not consistent with the medical evidence of record. Tr. 24.

Next, the ALJ found that Plaintiff could perform the unskilled jobs of garment bagger, bottling line attendant, and food preparer, which, as noted above, the VE testified

---

[4] The GAF is a numeric scale ranging from zero to one hundred used to rate social and psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n, Text Revision 2000) (DSM-IV-TR). A GAF of 31-40 is defined as having some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id*. A score of 41 to 50 indicates "serious" impairment in these functional areas. *Id*. However, "[i]n recent years, the agency has recognized, and [the Eighth Circuit has] noted, that GAF scores have limited importance." *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016).

that a hypothetical person with Plaintiff's RFC and vocational factors (age, education, work experience) could perform and that were available in significant numbers in the national economy. The ALJ noted that the VE's testimony was inconsistent with the information contained in the DOT, but the ALJ relied on the VE's 37 years of experience as a vocational rehabilitation specialist and as a VE to accept his opinion that the RFC would allow for the performance of the three jobs listed above. Tr. 25-26.

Accordingly, the ALJ found that Plaintiff was not disabled under the Social Security Act. Plaintiff filed a timely request for review by the Appeals Council of the Social Security Administration, which was denied on January 8, 2018. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ erred in relying on the VE's testimony to find that Plaintiff could perform work in the national economy notwithstanding her functional illiteracy. According to Plaintiff, the VE's testimony indicated that Plaintiff's illiteracy would render her incapable of working. Plaintiff further argues that the ALJ's RFC finding and, in turn, the ALJ's hypothetical question posed to the VE, were erroneous because the ALJ failed to properly evaluate the medical opinion evidence provided by Plaintiff's treating psychiatrists and the third-party testimony of Plaintiff's husband. Plaintiff asks that the ALJ's decision be reversed and that she be awarded benefits.

# DISCUSSION

## Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must review the entire administrative record to determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "may not reverse merely because substantial evidence would support a contrary outcome. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id*. (citations omitted). A reviewing court "must consider evidence that both supports and detracts from the ALJ's decision. If, after review, [the court finds] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the decision of the Commissioner." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citations omitted). Put another way, a court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. *Id.*

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations,

found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is medically equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work. If the claimant cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors – age, education, and work experience. *See, e.g.*, *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). When a claimant cannot perform the full range of work in a particular category of work (medium, light, and sedentary) listed in the regulations, the ALJ must

produce testimony by a VE (or other similar evidence) to meet the step-five burden. *See Baker v. Barnhart*, 457 F.3d 882, 894 (8th Cir. 2006).

**VE's Testimony**

Plaintiff argues that the ALJ erred in several respects by relying on the VE's testimony to find that Plaintiff could perform work in the national economy notwithstanding her functional illiteracy. The Court rejects each of Plaintiff's arguments.

First, Plaintiff argues that the VE's testimony stating, "I do have an opinion, and I don't believe that she could work," was "at odds with his later testimony indicating that plaintiff could perform jobs outside the DOT." ECF No. 16 at 6. But, when read in context, the VE's testimony that he did not believe that Plaintiff "could work" clearly referred only to Plaintiff's past relevant work as a cashier. The VE later testified that a hypothetical person with Plaintiff's RFC, including her functional illiteracy, could perform other jobs in the national economy. There was no inconsistency in the VE's testimony.

The VE and the ALJ both acknowledged that the VE's testimony regarding other jobs in the national economy did conflict with the DOT. In light of such a conflict, the ALJ had a duty to "elicit a reasonable explanation for the conflict and resolve the conflict by determining if the explanation given [by the VE] provides a basis for relying on the VE testimony rather than on the DOT information." *Moore v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014) (citations omitted). "Absent adequate rebuttal, . . . VE testimony that conflicts with the DOT does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the

11

economy a claimant can perform." *Id.* at 990 (citations omitted).

Here, the ALJ satisfied his duty by eliciting and accepting the VE's explanation that, based on his decades of experience in the field of vocational rehabilitation and as a VE, along with government studies, a person who is functionally illiterate could perform the jobs identified. *See, e.g.*, *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846–47 (6th Cir. 2004) (affirming an ALJ's decision to credit a VE's testimony over the DOT that a person who is functionally illiterate could perform jobs in the national economy, where the ALJ found that the VE was credible and the hypothetical question posed to the VE accurately reflected the claimant's limitations); *cf. Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001) (holding that "[a] claimant is not per se disabled if he or she is illiterate," and that in order for an ALJ to rely on a job description in the DOT that fails to comport with a claimant's literacy limitations, the ALJ need only explain the deviation).

Next, Plaintiff argues that the VE lacked an adequate foundation to testify regarding "job numbers that are national" because the VE "indicated his national practice is more in the nature of a [VE]" rather than "placing individuals in work settings." ECF No. 16 at 6-7. This argument lacks merit. Plaintiff stipulated to the VE's qualifications and did not object to his offering an opinion about the number of jobs existing in the national economy. *See, e.g.*, *Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926 (11th Cir. 2010) (rejecting a claimant's argument that a VE's testimony lacked a proper foundation where the claimant failed to object to the VE's qualifications or testimony at the evidentiary hearing). In any event, the ALJ was entitled to rely on the VE's experience in

the field of vocational rehabilitation generally.  *See Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014) (holding that a claimant's objections that a VE's explanations "were based upon insufficient personal experience and unreliable scholarly literature" raised "fact issues for the ALJ to resolve," and noting that, in crediting a VE's testimony, an ALJ may rely on a VE's experience and other relevant sources of knowledge).

Finally, Plaintiff suggests that the VE's reference to "sheltered work" rendered his testimony unreliable.  Plaintiff is correct that "the possibility of work in a sheltered workshop is not substantial evidence supporting a denial of disability benefits."  *Gavin v. Heckler*, 811 F.2d 1195, 1198 (8th Cir. 1987) (citations omitted).  But the VE here clarified, in response to further questioning by the ALJ, that the jobs he identified as being appropriate for a person with Plaintiff's RFC were jobs that were available in the national economy as opposed to a sheltered workshop.  With this clarification, the ALJ did not err in relying on the VE's testimony.

## **RFC Finding, Hypothetical Question, and Weight of Medical Opinions**

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  "However, there is no requirement that an RFC finding be supported by a specific medical opinion."  *Id.*  Likewise, to constitute substantial evidence, "the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole."  *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) (citation omitted).  Here, the Court

13

concludes that the ALJ's RFC determination is supported by sufficient medical evidence, and likewise, the ALJ's hypothetical question included those impairments the ALJ properly found substantially supported by the record as a whole.

Under the applicable social security regulations,[5] the opinion of a treating physician is "normally entitled to great weight." *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (citation omitted). "However, the Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence," and "[t]he Commissioner may also assign little weight to a treating physician's opinion when it is either internally inconsistent or conclusory." *Id.* "In considering how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations." *Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007).

The ALJ did not totally discount the treating psychiatrists' opinions. Rather, he accounted for some of the psychiatrists' findings as to Plaintiff's limitations in social functioning and in concentration, persistence, and pace, by including several related limitations in the RFC. These included limitations to simple, routine, and repetitive tasks; only occasional decision-making and changes in the work setting; and only occasional

---

[5] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the Administration will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. § 404.1520c.

interaction with supervisors, coworkers, and the general public.

To the extent the ALJ discounted the more extreme limitations set forth in the Plaintiff's treating psychiatrists' opinions, the ALJ's decision is supported by substantial evidence. The ALJ gave good reasons for discounting the opinions, including that they conflicted with the psychiatrists' earlier examinations and those of other mental health professionals, which reflected relatively conservative treatment, management of symptoms with medication, and mental status examination results that were consistently within normal ranges, including appropriate demeanor and appearance, normal speech and mood, and fair or reasonable insight and judgment.[6] *See, e.g.*, *Halverson*, 600 F.3d at 928 (holding that the ALJ properly discounted a treating psychiatrist's opinion when it was inconsistent with the psychiatrist's own treatment notes and those of other mental health providers, which showed mostly normal mental status examinations).

The same reasons supported the ALJ's decision to discredit the third-party testimony of Plaintiff's husband. *See Rutledge v. Colvin*, No. 4:12CV1908NCC, 2014 WL 3419171, at *8 (E.D. Mo. July 14, 2014) ("[A]n ALJ may properly discount opinions of third parties for the same reasons she discounts the opinion of a claimant, including that

---

[6] Likewise, although Plaintiff does not focus on the issue in her brief, substantial evidence supports the ALJ's decision not to rely on the extremely low GAF scores assigned by the treating psychiatrists, particularly in light of the history of much higher GAF scores—indicating essentially normal functioning—and the lack of explanation in the record as to the drastic change in assessment. *See Halverson*, 600 F.3d at 930-31 (holding that an ALJ properly discounted a treating psychiatrist's GAF score of 40, in light of a history of higher GAF scores indicating only moderate symptoms).

the opinions are inconsistent with medical evidence of record.") (citing *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 2006)). The ALJ was responsible for weighing the conflicting evidence, and the Court cannot say that the ALJ's decision fell outside the available "zone of choice."

In sum, upon review of the record, the Court concludes that the ALJ's decision is supported by substantial evidence in the record as a whole.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**. A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated on this 11th day of March, 2019.